for the University of Texas at Austin. Go ahead. May it please the court. Qualified immunity bars plaintiff's claims against UT Austin's former president, Jay Hartzell. There are three main reasons why. First, plaintiffs did not plausibly allege that Hartzell was personally involved in the supposed unlawful acts. Second, it was not clearly established that Hartzell could be individually liable under section 1981. And third, plaintiffs did not plausibly allege that they were discriminated or retaliated against in the terms of their pay, promotions, and endowments. For the first main point, plaintiff's claims against Hartzell fail for lack of personal involvement. To start, many of the alleged adverse acts occurred before Hartzell's appointment as president, which indicates he could not have been involved. For instance. But I thought that there was some group that was looking at the question of whether there was Hispanic situations and discrimination. And he threw that entity out. You're talking about the Equity Review Process Consultative Committee, ERPCC, I believe? I guess. But there was an entity he threw out that was looking at this question. Why isn't that something he did? Whether it was good or bad, I'm not saying. I'm just saying, why isn't that something he did? That is something he did. That's something he did after they performed zero work for about a three-month period, even after being formed. But plaintiffs also admit that the UT Austin itself was performing university-wide studies about compensation, and that UT Austin was making university-wide compensation adjustments and raises. That included the Second Faculty Investment Initiative. That is one of the focal points of this lawsuit, where UT Austin distributed $3 million in equity raises to underpaid professors. Does that answer your question, Your Honor? Well, you were saying he wasn't involved. I mean, I know there were some things he wasn't involved in, but you were basically saying he wasn't involved in anything. And I'm saying, wasn't he involved in throwing out some things? Well, for one thing, plaintiffs do not allege that they would have received any sort of raises had the ERPCC finished its work. In fact, Martinez himself admits that he received a $37,500 raise in the First Faculty Investment Initiative. That's on Record on Appeal, page 1151. So the ERPCC appears to be just a distraction. They're not claiming that they would have received any sort of pay promotions or endowments had this committee been allowed to finish its work. And it doesn't change the fact that prior to the ERPCC being disbanded, that UT Austin distributed $306,000 in equity raises to Hispanic professors. That is a percentage that far eclipses the percentage of Hispanic professors in the workforce. So Hispanic professors make up 18% of the total funds distributed. There was $1.7 million distributed. And Hispanic professors only account for 7% of UT Austin's workforce. So they received the lion share of that Faculty Investment Initiative raise that was distributed under Hartzell. And support for that can be found on Record on Appeal, page 426 and 910. So back to the other point. Many of what plaintiffs are alleging occurred, many of these adverse acts occurred before Hartzell was even appointed. So for instance, they're complaining about promotions they did not receive in April and May of 2020, but Hartzell was not appointed as president, as plaintiffs admit, until on or around July of 2020, three months after. So he could not have been involved in those prior promotion decisions. Support for that can be found on Record on Appeal, page 462 and 469 through 470. Plaintiffs also admit that deans and department chairs, not UT Austin's president, were mainly responsible for making pay and promotion decisions. Support for that can be found on pages 469, 493, 510, 936, and 1135 on the Record. Now, plaintiff's main argument is that Hartzell had the authority to approve a subordinate's recommendation about a professor's salary advancement or promotion. But there are no allegations that Hartzell ever actually reviewed any recommendations that a subordinate made about the plaintiffs themselves, much less that he ever denied any such recommendations. Now, as to approving any such employment decisions, that falls under a ratification theory, which this court has found only applies to extreme factual situations. And to be liable here, Hartzell must have approved not only the decision itself, but the discriminatory basis for that decision. And plaintiffs allege no facts on that point. Plaintiffs also do not allege deliberate indifference. And this is what I was touching on earlier. So most notably, plaintiffs admit that during Hartzell's tenure, UT Austin distributed $306,000 in equity raises to Hispanic professors, as I just discussed. They were making these university-wide compensation studies. And they were making university-wide compensation adjustments following these studies. Support for that can be found on Record on Appeal 426 and 467. For the second main point, qualified immunity protects Hartzell as individual liability under Section 1981 was not clearly established. In Felton v. Poles, this court found that it was not clear whether individual liability was available under Section 1981. In Foley v. The University of Houston Systems, this court found tension in the precedence on the individual liability issue. It found tension, but it didn't find that it didn't exist, correct? It declined to define the contours, which is different from saying it doesn't exist. It just means we don't know how far it extends. Sure, it said we weren't talking about the outer bounds, but it also noted the tension in its precedence. It noted the issue with Odin v. Okabeha County, where this court found that, with respect to discrimination in the terms of a municipal employment contract, that individual liability did not lie under Section 1981. Rather, the proper defendant is the government employer in its official capacity. Didn't it also note that the district court found that there was an existence of a factual, a genuine issue of material fact regarding whether the defendant was essentially the same as the state? In other words, it said we have to reach this issue first before we get to qualified immunity, before qualified immunity attaches it. So why is it part of the clearly established problem? I'm sorry. Can you say that last part again? Sure, sure. The court... In Foley, right? Yeah, in Foley. The issue of qualified immunity arises only if the individual official is subject to liability in the first place. So my question is, why is the existence of a cause of action under 1981 part of the clearly established prong if we have to decide if there's a cause of action to begin with? And in Foley, the district court found that there was a fact issue, and the Fifth Circuit said, yes, there's a fact issue, and then went on to address qualified immunity. In other words, where do we consider whether this cause of action exists? Well, for one thing, the district court did not actually find that in Foley. And we cited that in our brief, and we attached those decisions to the appendix. If you review the district court's underlying orders, the district court made no such finding on whether or not any of the individual defendants actually exercised control over the plaintiff's positions or titles in that case. Doesn't the appellate decision say, in the instant case, the district court found genuine issues of material fact as to whether the appellants exercised control over the faculty positions and titles held by Dr. Foley and Dr. Hutto? If so, the appellants were essentially the same. So isn't that essentially saying there's a fact issue as to whether there's a cause of action here? This was one of the reasons why we were saying that that statement in Foley is dicta, right? So if you actually read the district court's orders, the district court did not actually make that finding. I have been up and down those decisions. I have seen no evidence of it. And I believe if your honor's reviewed those decisions yourself, you will see that. One of the issues was that, with Foley, it was making this precatory statement about whether or not individual liabilities exist under Section 1981 so it could reach the defendant's actual qualified immunity arguments, which had nothing to do with whether individual liability was available under Section 1981. And that may have been the cause of some of the issues with that decision. I think it's one of the reasons why Foley's statement about essentially the same should be considered dicta. Other parts of that, Foley was saying that Odin was limited to municipal employment contracts, where just a year prior, this court said in Felton that it saw no reason why Odin's holding would not extend state employment contracts. Back to Foley. So if it's dicta, I think what you're saying is it couldn't have put Hartzell on notice that he has individual liability under 1981? Exactly. Therefore, qualified immunity. And yeah, this court has been quite clear about that, right? To the extent it's dicta, then it could not be a binding holding that would be clearly established precedent as needed to overcome Hartzell's qualified immunity. So this case resembles the situation Put it in terms of this case. Meaning, he has to be on notice that the only affirmative action I've heard, and maybe the other side can tell me some other affirmative action, is he disbanded a committee. OK, so he would have to be on affirmative notice that because he disbanded an equity committee, that he's going to be on the hook for individual liability under section 1981? Essentially, Your Honor, yes. So this case resembles the situation this court faced in Sims versus the city of Madisonville. There, the issue was whether a non-final decision maker could be individually liable under section 1983 for a First Amendment retaliation. In that case, the court reviewed its precedents. It found tension in the case law. It found inconsistency in the precedent. And it granted the defendant qualified immunity due to the unsettled nature of the case law. The same result is warranted here. For the third main point, plaintiffs also did not plausibly allege they were discriminated or retaliated against. First, plaintiffs' 2018 and 2019 reports confirmed that they were complaining about unintentional discrimination, which is not actionable under a disparate treatment theory. In their 2018 report, plaintiffs cited pay compression as the main driver of pay inequities. Now, pay compression is a phenomenon wherein newly hired professors are receiving higher market or higher salaries than that of their longer-serving peers due to market forces. There's nothing inherently discriminatory about it. Support for that can be found on Record on Appeal, pages 1132 through 33 and 1150. In their 2019 report, plaintiffs cited hispanopia as the cause of the inequities complained of here. That is a term they invented to refer to unintentional, not intentional discrimination. Support for that can be found on Record on Appeal, pages 977 through 78. Now, plaintiffs' response is to ask this court to ignore these statements. But plaintiffs made their reports part of their pleadings and central to their claims. And thus, this court can properly consider them when analyzing the plausibility of plaintiff's claims. Second, plaintiffs did not plausibly allege that the disparate pay, promotion, and endowment decisions occurred because they are Hispanic. Plaintiffs mainly allege that they were treated less favorably than non-Hispanic peers, even though plaintiffs had a better publication record, taught more courses, and served longer as professors. But plaintiff's own reports, plus other judicially noticeable documents, undercut plaintiff's own allegations. With regard to publications, plaintiffs admitted in their 2018 report that publications are already factored into a professor's yearly earnings. What is your response to this document that he gave us this morning and gave you? Would you mind if I go to the table to pick up that document? OK, go. Unfortunately, I was going to address this on rebuttal. I don't think I have time to go through it. Oh, and that's fine if you want to. You have rebuttal. Is that OK? Yeah, I just wondered what you thought, because it is kind of a list. It is a list. Well, for number two, and I'll see as much as I can get done in the next few minutes, it's talking about they're notifying Hartzell of Hispanic academic programs. Hispanic academic programs are not an issue in this lawsuit, right? It's pay promotions and endowments. So that is not what this case is about. That is a red herring. Number four, it's talking about Hartzell receiving formal written requests for Hispanic equity raises. Plaintiffs offered no allegations suggesting they ever notified him about promotion or endowment issues, as is needed to put Hartzell on notice of these issues for him to be deliberately indifferent, as this court has found. In Dovey-Ferguson, this court found that a plaintiff must plead actual facts, not speculation about a defendant's knowledge of the underlying issues to be deliberately indifferent. Plaintiffs led no facts on that point with respect to the promotion and endowment issues they're raising. And for number four, they're making this report to him about equity raises. Well, what happens after that? UT Austin awards $3,000 to $6,000 in equity raises to Hispanic professors. See, with respect to numbers six and seven, these are issues that occurred before Hartzell was actually appointed president. So number six is talking about a report, I believe, in 2019 that was about nearly a year before Hartzell was appointed president. Plaintiffs allege no facts that he was ever aware of this 2019 report. They're speculating about that. With regards to UT released its own data showing Hispanic professors were underpaid, well, again, UT Austin also made significant adjustments. Two faculty investment initiative raises totaling millions of dollars to address any such issues. And that occurred before and during Hartzell's tenure. She has a question, but I'll let you respond to the rest on rebuttal. But she has a question. Aren't we here on a 12B6 motion? Isn't the standard here for them to sufficiently allege enough facts to overcome qualified immunity? It seems that you're contesting whether they can actually establish those allegations with evidence. But at this point, don't they just need to allege enough facts? And I guess my question is, why aren't these allegations sufficient to allege personal involvement and Mr. Hartzell being essentially the same as the state? Well, on 12B6, it could also go to whether or not plaintiffs pled a constitutional violation. So the plausibility of plaintiff's allegations against Hartzell are probably before this court on this appeal. With respect to whether or not their allegations are sufficient, their allegations are pretty threadbare to begin with. And I think the bigger problem is that they have submitted their own reports, their own statements that undercut their allegation. There's that in the judicially noticeable documents. So this is both a case where the plaintiffs have pled too little, but they've also, in a way, pled too much. This court noticed that issue in Simmons v. Perry Welsh Lumber Co. It's 113 F2D 812, where it said, this is not a case where the plaintiff has pleaded too little, but where he's pleaded too much and he has refuted his own allegations. The litigant may be defeated by his own evidence. The pleader by his own exhibits. Plaintiff's own exhibits addressing the exact same inequities that they're citing here as evidence of discrimination. While in plaintiff's own reports, they're saying this is due to pay compression, nothing inherently discriminatory about it, as the Sixth Circuit found in Zanvakili versus the University of Cincinnati. And they're saying it's due to hispanopia, which plaintiffs defined to refer to unintentional discrimination, quite clearly unintentional discrimination, which would not be a viable cause of action here. OK, you have time for rebuttal. We'll now hear from Robert Schmidt. Yes, thank you, Your Honors. Pronounced it. That is right, that is right. I may have pleased the court. I'm happy to answer any questions, but I do have three main points I'd like to make. First off, it is absolutely clearly established law that a state public employee can be held individually liable for race discrimination. We've got Faraka. What holding of this court says that an individual state official can be individually liable under Section 1981 and Section 1983? Beg your pardon? What holding of this court holds that an individual state official can be individually liable under Section 1981? First of all, under Section 1981, Faraka versus Clement absolutely held that. 1975, isn't that before Jett? It is before Jett. And the requirement in Jett was that you can't bring a 1981 claim alone. You have to bring it through 1983. But it did not in any way touch individual liability. Jett had nothing to do with individual liability. And it didn't say there's no individual liability. It was a procedural, I don't want to say necessarily procedural mechanism, but you have to bring a 1981 claim through 1983. And we've absolutely alleged that. But Faraka says you can be individually liable under 1981. At that time, they didn't have the requirement to bring it under 1983. But it's still the holding held that a state official, a director of an agency, can be held individually liable for discrimination. All of the subsequent decisions from our court since 1975 saying, well, it's not clear. Is this dicta, da, da, da, da, da, not significant for qualified immunity purposes? I don't agree. I don't agree, Your Honor. Foley and- Don't agree with what? Don't agree with what? I don't agree that the other decisions following that did not, that said it wasn't clear or that there's not liability in any way. What Foley said, that's 25 years ago, Foley said that a state employee can be held individually liable for race discrimination under 1981. It was actually retaliation, race retaliation, under 1981. And the claim that that is dicta is just completely false. They say, they accept, that if the individual exercises control and authority over the faculty positions and titles, they may be held individually liable. If they did not make that, they start that decision at the very beginning saying, we've got to address this because otherwise, there's no reason to even go through the issue of, is there enough evidence if they were retaliatory, is there enough evidence? You've got to, it's foundational to Foley. It's foundational. And again, Farraka also says that there's individual liability under 1981. Jett did not change anything. The other decisions that they cite that sort of muddy the waters, they're trying to muddy the waters on this, Felton actually supports the case. It distinguishes, it explains Farraka, but it never in any way casts any doubt on Farraka. The other cases that bellows, it actually accepts Farraka. It doesn't cast any doubt on Farraka. It distinguishes it because in that case, it was a corporate defendant. But to say in 2000 and 2025 that a reasonable state employee felt that they could intentionally discriminate on the basis of race. That is not the question under qualified immunity. We have cases that go from this bench way out this courtroom that say you have to define clearly established law with some specificity as to facts. Of course, everybody knows you can't discriminate on the basis of race. That's not the qualified immunity question. That's just the first part of it. No, it's not even the first part. Well, the second part is exactly what you said. And that is, did we establish facts? Did we plead facts that would alert a reasonable employee that their actions were in violation of the law? And there's cases out there, Your Honor. I have a list. You've given us a list. That's helpful. And I'm looking at this list. Can you identify on this list how many of these items? I have 16 items. Are sentences that say Hartzell did something? Because I see one, but. Yeah, I can go through the points on here, but I can't. How many on the list say Hartzell did something, as opposed to Hartzell didn't do something, or Hartzell received something? What did he did, did, that he did? Hartzell disbanded the committee. OK, that's one. That's one. But Hartzell. Anything else? Hartzell received notice. In action, he received notice. If he gets notice that there is serious discrimination here, and Hartzell then, and also the second thing is he does not respond. OK, does not respond in action. But when you are put on notice that there is discrimination, and this was not just insignificant discrimination, your honors, let me address your point here first, though. He receives notice. He does not, in response to that, do anything. He then disbands the committee that is set to review these Hispanic inequity issues. And then, I think it is incredibly important, your honor, this court gives credence to the text of statutes. It gives credence to the words, the actual words. And it is in black and white in UT's rules that no salary decision and no promotion may be made without the approval of the president. It's an absolute rule that is in there, and it's in black and white, that he has that responsibility, that duty, that action. That would mean, if I agreed with that, that would mean that anyone who is ever discriminated against at UT Austin, and there are, let's say, how many professors are there, 50,000, 25,000? OK, many professors, any time any professor is ever discriminated against or alleges that he or she is discriminated against on the basis of race, because of that rule that you just cited, the president can be sued for personal individual liability under section 1981 in every single case. That is. Is that yes or no? Because you just said, he has to approve every pay decision. Rules are that affirmative that yes, that's the case. I guarantee you they will be changing these rules after this lawsuit. But of course, only if he knows it, if the president knows that there was discrimination, as opposed to some person had done something wrong and they threw him out, and not because of their race or. These rules. No, no, you just said that the president, under the rule, is personally responsible for every pay decision. I did say that, yes. But only if, in this context, only if he knew or could know that it was discrimination, as opposed to something else. That is where there would be discrimination, exactly. Where's the allegation of that against President Hartzell? Where's the allegation of that, that knowledge? He received it in August of, it's point four, he personally received formal written notice from Hispanic equity raises on August 3, 2020, from Martinez and Zamora, who were part of these committees, asking for raises and saying this. And then literally, I do want to point out, literally months before. What's an equity raise? I'm sorry? What is an equity raise? Equity, equity, what is an equity raise? Equity raise is a raise intended to correct disparities. And when a person is paid less because of their, I mean, we don't have the text of what that email was. But the common sense of equity, it's been all in the news everywhere. Yes, it has been in the news. I'm not sure there's a common sense to it. What does it mean, equity? Does it mean I'm Hispanic and I'm not making as much as this professor over here who's white? Ergo, there's been race discrimination. Is that what equity means? Equity means discrimination. And let me just make this point, if I can. Drs. Martinez and Dr. Zamora only want what every single person in this courtroom wants. And that is to be judged on the basis of their merits and not on the color of their skin. And what they point to is information. Equity means equality, then, in your view. It means no discrimination. And they have pled in their pleadings that they were specifically paid less and received less promotions than three similarly situated peers under the same decision makers, who are full professors, who had less distinguished records than them. Less publication, less time at UT. This is not just making something up fanciful. This is real discrimination. And truly, there is what they are. You're saying, because that was communicated to Hartzell, I want an equity raise. And he didn't give the equity raise. Or you're saying, and I'm not even sure you pled that. But you're saying, he didn't do it. Therefore, he can be personally liable under Section 1981. Under this scenario, where he has the rules specifically say, it's just black and white. No commitment regarding salary or promotion may be made without the president's approval. It also says, unequivocally, in black and white, that the president must do a final evaluation of all raise requests, and they must do a final, makes the final decision. You understand what I'm asking? I'm not asking about, ultimately, whether they could prove a violation of 1983. I'm asking whether the president can be individually liable. At a 12B6 stage, we have pled facts that make logical inferences, fair inferences, not just mere summarizing the elements or conclusory statements, but facts. If you compare this case, by the way, to Ashcroft versus Equal, it's night and day. In that case, and that was also a qualified immunity case about discrimination, in that case, the only pleadings that they had were that John Ashcroft and Robert Mueller were the masterminds behind a plan to affect invidious discrimination of the treatment of a person in jail. That was literally all they had. Ashcroft and Mueller knew that this was happening. It was just conclusory statements. We have factual information here. We also have specific rules of the university. It's black and white that you have to, at least at the 12B6 stage, give inference to a positive inference that he follows these own rules. If you don't do that at the 12B6 stage, it's dishonest. I don't mean to. And the rule is, and the rule you're saying is that because the rule says he personally approves every pay increase, every single time, he knows. He's individually liable every single time. Anyone says, I'm not being paid enough because of my race, and he doesn't give them a raise, he's individually liable. That is what the rule states. That is what the rule states. And again, if we go to past the 12B6 stage, and he shows that he had nothing to do with it, he assigned it to someone else. But I don't see how could he ever say he doesn't have anything to do with it. You just said the rule said he is personally responsible for every single pay. That may be an issue that we have to grapple with later at summary judgment, and when this court has more information in front of it. But at a 12B6 stage, where the rule unequivocally in black and white says he is responsible for these things, I think there's a reasonable inference there. And we're not just making something up out of cold cloth. We've cited the facts. Is this about inference, or is this about whether the plaintiffs have sufficiently alleged enough facts to show that President Hartzell was essentially the same as UT, based on personal communications to him, not just generally about discrimination, but about specific instances? And studies affirming that. I think it is both, but he absolutely did have specific written requests to him, saying we need equity raises. He starts a committee about it to do the equity review of Hispanic raises. And then he disbands the committee after charges of discrimination were filed. So there's actual activity there on his part. There's notice of discrimination. Did I already say how the UT study that came out months before he was there, which it's a reasonable inference that the president has access to these UT studies that were months before he came into office, found that there is an 11% difference between the salaries of Hispanic full professors versus non-Hispanic professors, accounting for field and experience. And that's sufficient to allege intentional discrimination? Is that what you're saying? Because you have a statistic saying there's 11% disparity. That shows intentional discrimination, meaning the people in charge of salaries are saying, I want the Hispanics 11% less. No, no. It does not prove intentional discrimination. You're right. Then what are you alleging, then, if you're not alleging intentional discrimination? It is a fact that raises concerns. And it is something that is worth looking at when you have Hispanic faculty. Don't you have to allege intentional discrimination in a writing? But we do, Your Honor. We allege specifically that our plaintiffs were paid less. And on average, in the time period, it was $25,000 a year less, under the statistics that were put out, that they were paid less than less qualified non-Hispanic professors under the same decision makers. And those decisions were ultimately evaluated by, under the rules, they were evaluated by and approved by President Hartzell. These are all factual statements. And there's reasonable inferences from them. Maybe another way to ask the question is, what evidence is alleged of intentional discrimination by President Hartzell? Again, it is that he has notice of discrimination, not necessarily, I understand your point, not necessarily a conclusive discrimination, but very interesting facts that one would want to look at if you are concerned about discrimination. He has notice of that. He stops any investigation into it. And then he affirms, he evaluates these salaries that are less than, for Dr. Zamora and Dr. Martinez, that are less than lesser qualified peers. He's under the same decision maker in the same department. And so he is responsible for making that evaluation and for making that decision. I understand. That is intentional discrimination. I understand from your complaint, because I'm reading it, in paragraph 100, you have a sentence that has Hartzell as the subject, and then a verb, a transitive verb. President Hartzell canceled the contractor's work. So I think that counts for, I allege that he did something. Can you show in your complaint where you allege he disapproved an equity raise, assuming that it would be even legal for him to approve something called an ex-equity raise after SFFA? But leave that to one side. Equity issue is a fuzzy issue. But it is a shorthand term for discrimination. No, it's not. Well, it can be. Many people use it as a shorthand term. Some people do not. Some people do. But again, Well, I asked you, where have you alleged? I see that you've alleged that he canceled the ERPCC. Where have you alleged that he disapproved these equity raises for these particular plaintiffs? Your Honor, I don't have my pleadings in front of me. But in our complaint, we absolutely allege that he did not give these equity raises to these individuals. Your Honor, I'm a good attorney. I would not be bringing a case if they got these raises, if they were being paid the same. We have a duty of candor to this court. And we would never bring this lawsuit if these equity raises were granted. And it's alleged that he intentionally discriminated against them by not paying them the same or paying them appropriately compared to less qualified non-Hispanic professors. So the, and I also do want to point out Well, your allegations are about pay, but also about promotions and endowments. Where have you alleged that he failed to promote, that he intentionally did not promote on the basis of race, that he intentionally did not give an endowment on the basis of race? We also allege that Mr. Zamora, in particular Professor Zamora, did not get an endowment until 2022. He did finally get an endowment, but that his endowment does not pay as much as less qualified people, less qualified non-Hispanic professors, who are getting paid more under their endowment than Professor Zamora. So there are allegations. If I may be able to say one. Where do you realize that Hartzell did that? But it's required under the rules that he has to approve every pay promotion and pay and promotion decision. So now because of the rules, he's personally responsible for every failure to do a pay increase. He's personally responsible for every failure to promote, and he's personally responsible for failure to give an endowment. At a 12B6 decision, that's what the rules state. That is what the black and white rules state. May I say one other thing right now? I also believe, I don't have this in front of me, and if I'm misstating it, I apologize, but I believe that there is case law that an inaction can also be the same as an action. If you are not taking action in the face of something that you know is there. So I don't think just because he doesn't give the raise, or I mean he doesn't, he reviews it and doesn't give the raise, that still counts as an action when you're not paying someone equally, or on their merits and you're treating them differently because of the color of their skin. And that's what we're, it's a 12B6 motion, your honor. Thank you very much. We appreciate you very much. All right, we'll now hear the rebuttal. Just a few points. With respect to one of the points Judge Duncan was just asking, yeah, plaintiffs did not actually allege that Hartzell had ever denied any recommendations that ever came by his office concerning their pay promotions and endowments. They simply do not allege that point. It is not in their complaint. With respect to the notice issue, I mean this is essentially what plaintiffs are holding   cases about. They're saying, well, Hartzell had notice of pay inequities. And they do not allege he had notice of promotion or endowment inequities. So they're saying he had notice of pay inequities and he did nothing to fix it. Well, first of all, that's not true, right? UT Austin, during his tenure, distributed $306,000 in equity raise to Hispanics. Plaintiffs may not think that's enough, but that's not evidence of deliberate indifference, right? That's a high bar under this court's precedence. It may be evidence of illegal discrimination under SFFA, but not the kind of discrimination we're talking about. And on that point, so those equity raises did not just go to minorities. They went to underpaid professors. Now, Hispanic professors received more, like I would say, a lion's share of the raises compared to their percentage of the workforce. But this was a raise for him. I thought they didn't get as much as they were supposed to. And that was because of Hartzell. Well, they're saying that Hartzell reduced the total funds distributed from $3 million to $1.7 million. First of all, plaintiffs are not saying that their pay, that they would have received any more in these FII-2 raises than they did already due to any reduction in the total funds, for one, right? So we're talking about plaintiffs being injured in and of themselves, and they're not alleging that. Second of all, this is why the ERPCC was formed. It's to figure out what to do with the remaining, I think it was $1.3 million in equity funds after the initial $1.7 million disbursement. Now, plaintiffs- But what about the fact that, you know, he keeps saying it's 12v6, which is a very early kind of cubbied arena. Now, I know a lot of qualified immunities get given then, and I'm well aware of qualified immunity, but I'm still kind of wondering, there's a lot of la, la, la, la, la being said here. Why isn't that more gonna be on the, at least the summary judgment stage? Well, the la, la, la being said is plaintiff's own statements about the exact inequities they are complaining about here, right? These are their own words in their 2018, nobody made them write this. They did this- The stuff we're talking about, they pled. I'm sorry? They pled all this. Yeah, they pled all this, and they incorporated their own reports into their pleadings. So they are part of the complaint now. You can look at their own statements about what the causes were for the pay inequities, salary, promotion, endowment inequities they're complaining about now. You can see what they said in 2018, 2019, before they filed the lawsuit, and it was not anything that would be actionable here, right, they're citing pay compression, nothing to do with discrimination. They're citing hispanopia, which they themselves are saying is unintentional discrimination. With regard to what Judge Duncan was saying, what they're alleging is basically Hartzell would be individually liable for every pay decision that comes across his desk, now, going forward, UT Austin's president, the president of every other university, et cetera. That is not what this court has found sufficient to warrant personal liability under Section 1981, right? This is why this court has limited the ratification theory, approving a subordinates decision, to extreme factual situations. Again, Hartzell must have approved that decision because he was aware of the subordinates discriminatory motive when making that decision. Plaintiffs allege nothing even remotely close on that point. With regards to plaintiff's publication records, again, in their 2018 report, they're saying that this was already factored into their earnings by a preset formula that would allow for no room for discrimination. Plaintiffs are not alleging they received anything less than what they were entitled to with regards to their publication records under this preset formula. Support for that is found on record on Appeal 1136. Respective plaintiffs are alleging that they taught more classes than their peers. Well, under UT Austin's faculty workload policy, faculty who are qualified as research-intensive teach a 2-2 class schedule. Faculty who do not qualify teach a 3-3 class schedule. So the fact that plaintiffs are teaching more classes does not mean that they're more qualified. It just simply means they do not meet the department's expectations to be considered a research-intensive professor. With regards to their length of service, this is, again, these are their main allegations is what they're saying is the disparate treatment, right? This is their main allegation for disparate treatment at issue here. Plaintiffs are saying, well, we serve longer than our peers. Well, that just gets back to pay compression, which plaintiffs said is the main driver of pay inequities when it comes to professors. And that uniquely affects longer-serving professors. And there is nothing inherently discriminatory about pay compression as the Sixth Circuit found in Zanfacchile versus the University of Cincinnati. Okay, thank you. We appreciate both sides' argument. The case is now in our bucket.